

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-406-CV

ROSE OLMOS HERRERA                                              APPELLANT

V.

MUHAMMAD ASLAM MALIK, M.D.                                      APPELLEES
AND SURGICAL CONSULTANTS OF
FORT WORTH, P.L.L.C.

------------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In four issues, Appellant Rose Herrera appeals the jury's verdict in favor

of Appellees Muhammad Malik, M.D. and Surgical Consultants of Fort Worth,

P.L.L.C.  Because we hold that the testimony of Dr. Malik's expert on the issue

---

[1] *See* TEX. R. APP. P. 47.4.

of negligence was admissible and that the evidence was sufficient to support the jury's verdict, we affirm the trial court's judgment.

## II. Factual and Procedural History

In March 2001, Dr. Malik performed a laparoscopic cholecystectomy (gall bladder removal) on Herrera. Dr. Malik recommended the surgery to treat Herrera's chronic cholecystitis (gall bladder disease) and cholelithiasis (gall stones). A laparoscopic cholecystectomy is one in which the surgeon views the gallbladder via a laparoscope—a small camera—inserted through a small incision in the abdomen. The surgical instruments used in the surgery are also inserted through small incisions. Alternatively, an open cholecystectomy is one in which the gallbladder is removed through a single incision in the abdomen; the incision used is larger than the incision in a laparoscopic procedure. Prior to the surgery, Herrera signed consent forms acknowledging the possibility that there might be exploration with cholangiograms (contrast x-rays of the biliary system) or that the surgery could be changed to an open procedure if necessary.

During the course of the surgery, Dr. Malik removed Herrera's gallbladder and placed surgical clips on various ducts and blood vessels inside Herrera's abdomen to prevent fluid or blood from entering the abdominal cavity. He also performed an intraoperative cholangiogram ("IOC") During the IOC, still photographs were taken, and Dr. Malik also observed the dye flow on a

television monitor during fluoroscopy. Despite using the IOC, Dr. Malik mistakenly placed a surgical clip on Herrera's common bile duct instead of on her cystic duct.

Shortly after the surgery, Herrera began experiencing symptoms of jaundice. She was hospitalized again, and Dr. Thomas Dewar, a gastroenterologist, examined Herrera's bile duct and discovered that it was blocked by a surgical clip. Dr. Malik referred Herrera to Dr. Thomas Shires, whom he considered a more experienced surgeon in the area of biliary repair, for removal of the clip. Dr. Shires operated on Herrera and found a surgical clip on the bile duct that was preventing the flow of bile into the intestine.

Dr. Malik and Herrera both presented expert testimony regarding Dr. Malik's actions during the surgery and whether those actions fell below the standard of care. At trial, Dr. Malik was called by Herrera as her first witness and again as an expert for the defense. Herrera also produced testimony from Dr. Gail Burbridge, and Dr. Morris Franklin testified for Dr. Malik.

The jury found that Dr. Malik was not negligent in causing the injuries to Herrera. This appeal followed.

### III. Evidentiary Ruling

Because Herrera's third issue concerns the admissibility of testimony at trial, we consider it before addressing the sufficiency of the evidence.[2] In her third issue, Herrera argues that the trial court erred by admitting Dr. Franklin's testimony on the issues of the applicable standard of care, Dr. Malik's lack of negligence, and a lack of a causal relationship between Dr. Malik's compliance with the standard of care and Herrera's injuries. The crux of her arguments under this issue is that Dr. Franklin should not have been allowed to testify on these matters because Dr. Malik's counsel failed to lay the proper predicate. She asserts that Dr. Franklin first had to testify as to the applicable standard of care but that his testimony on this issue was overly broad and nonspecific, conclusory, and speculative.

We review the trial court's admission of evidence for an abuse of discretion.[3] In a trial on medical malpractice claims, the *plaintiff* bears the burden of establishing the standard of care.[4] This court has already held that

---

[2] *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (affirming the rule that incompetent evidence, even if admitted without objection, cannot support a judgment).

[3] *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000).

[4] *Warner v. Hurt*, 834 S.W.2d 404, 407 (Tex. App.—Houston [14th Dist.] 1992, no writ).

4

the failure of an expert to state an opinion as to the applicable standard of care does not require the exclusion of the expert's testimony.[5] The failure to testify as to the standard of care "may ultimately go to the weight or value of the expert's testimony to the fact finder, but not to its admissibility."[6] Furthermore, an expert may give an opinion on an ultimate issue "if a predicate is laid to show that the expert knows the proper legal definition in the question."[7] All that was required in terms of predicate before Dr. Franklin could testify on a mixed question of law and fact was that he be given the law—in this case, the definitions of the legal terms in the questions being asked of him—so that he could apply those definitions to the facts and state his opinion on the matter. Dr. Malik's counsel advised Dr. Franklin that

> Negligence, when used with respect to the conduct of defendant, . . . means the failure to use ordinary care, that is, the failure to do that which a general surgeon of reasonable and ordinary prudence would have done under the same or similar circumstances, or doing that which a general surgeon of reasonable and ordinary prudence would not have done under the same or similar circumstance[s].
>
> Ordinary care, when used with respect to the conduct of defendant, . . . means that degree of care which a general surgeon

---

[5] *Shelton v. Sargent*, 144 S.W.3d 113, 125 (Tex. App.—Fort Worth 2004, pet. denied).

[6] *Id.*

[7] *Lawrence v. City of Wichita Falls*, 122 S.W.3d 322, 328 (Tex. App.—Fort Worth 2003, pet. denied).

5

of reasonable and ordinary prudence would exercise under the same or similar circumstances.

Dr. Franklin was thus given proper legal definitions of "negligence" and "ordinary care."[8] Because Dr. Franklin was given the proper legal definition of "negligence" and "ordinary care," he could then give his opinion as to whether Dr. Malik was negligent based on those definitions.[9]

Finally, Herrera argues that Dr. Franklin's testimony "on the subject of a lack of any causal relationship between Dr. Malik's alleged compliance with the applicable standard of medical care and the injuries, harm, and damages of Herrera were not admissible for the reasons set forth above in [Herrera's] brief." Dr. Franklin did not testify that Dr. Malik's misplacement of the clip did not cause any harm or injury to Herrera; he stated only that Dr. Malik complied with

---

[8] *Chambers v. Conaway*, 883 S.W.2d 156, 158 (Tex. 1993) (stating that "the physician has a duty to act as would a physician of reasonable and ordinary prudence under the same or similar circumstances" and that "a physician's failure to so act constitutes a breach of that duty"); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 366 (Tex. 1987) (considering definition of "ordinary care" as applied to a hospital and holding that defining "ordinary care" as "'that degree of care that a hospital of ordinary prudence . . .would have exercised under the same or similar circumstances'" was proper).

[9] *See Isern v. Watson*, 942 S.W.2d 186, 193–94 (Tex. App.—Beaumont 1997, pet. denied) (holding that expert doctor did not lack the proper legal concepts to testify on the defendant doctor's negligence because the expert was provided with the proper legal definition of negligence).

6

the standard of care and that his actions during the surgery did not constitute negligence. We overrule this argument.

For the reasons stated above, we cannot say the trial court abused its discretion by admitting Dr. Franklin's expert testimony. We overrule Herrera's third issue.

### IV. Legal and Factual Sufficiency

In Herrera's first issue, she argues that the jury's finding that Dr. Malik's negligence, if any, did not proximately cause her injuries is against the great weight and preponderance of the evidence and that the evidence established as a matter of law that Dr. Malik's negligence was a proximate cause of Herrera's injury.

### A. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[10] In determining whether there is legally sufficient evidence to

---

[10] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence"*

7

support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not.[11] If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof at trial, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law.[12]

When reviewing an issue asserting that a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.[13] When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of

---

*and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960).

[11] *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[12] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

[13] *Dow Chem. Co.*, 46 S.W.3d at 242; *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

the trier of fact.[14]   The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony.[15]

**B. Analysis**

A plaintiff in a medical malpractice case is required to prove by a preponderance of the evidence that the defendant's negligence proximately caused his injuries.[16]  To do this, the plaintiff must prove four elements: (1) a duty by the physician to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach and the injury.[17]  The standard of care is the threshold issue that a plaintiff must establish before the fact-finder determines if the defendant doctor deviated from the standard of care to a degree that constitutes negligence.[18]  As a general rule, expert testimony is required to establish the governing standard of care and whether that standard has been

---

[14] *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

[15] *Id*.

[16] *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988).

[17] *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, writ dism'd by agr.).

[18] *See id*.

breached.[19] In resolving competing expert testimony, it is the sole prerogative of the jury to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and this court's obligation "to see that the process was fair and carried out according to the rules."[20]

The evidence presented during the trial clearly established that Dr. Malik erroneously placed a surgical clip on Herrera's common bile duct, or hepatic duct, when he thought he was placing it on her cystic duct. The issue that the jury had to decide was whether that error rose to the level of negligence, thus making Dr. Malik liable for any damages proximately caused by the misplaced surgical clip.

Herrera argues that she established Dr. Malik's negligence as a matter of law through Dr. Burbridge's testimony that under the applicable standard of care, Dr. Malik should have properly identified Herrera's cystic duct prior to placing the clip on the duct, should have been aware of difficulties in visualizing the anatomical structures in Herrera's abdomen, should have performed an IOC,

---

[19] *See Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977); *LaCroix*, 947 S.W.2d at 950.

[20] *Welch v. McLean*, 191 S.W.3d 147, 160 (Tex. App.—Fort Worth 2005, no pet.) (quoting *Warner v. Hurt*, 834 S.W.2d 404, 409 (Tex. App.—Houston [14th Dist.] 1992, no writ)).

should have realized the cystic duct could not be visualized on the IOC, and should have converted to an open procedure and avoided injury to her common hepatic duct. She also argues that the evidence put on by Dr. Malik was factually insufficient to support the jury verdict.

Dr. Franklin's and Dr. Malik's testimony is directly contrary to Dr. Burbridge's testimony that Dr. Malik's failure to convert to an open procedure and his misplacement of the clip constituted negligence. Dr. Malik testified as to the applicable standard of care with respect to locating the common bile duct in relation to the cystic duct:

> A.    Identification of bile duct is not a standard of care. Awareness of where bile duct is standard of care. Identification where I would go and peel the overlying tissue in order to find out where common bile duct is, that would be dangerous. It is contraindicated and it would be a violation of standard of care. So my awareness is essential to know approximately where the bile duct may be under all this tissue.
>
>         . . . .
>
> . . . .
>
> Q.    [Herrera's counsel] All right. So what you're saying is the standard of reasonable and prudent surgical care in Mrs. Herrera's surgery was to be—to identify; that is, actually see through the scope the gallbladder, the neck of the gallbladder and the cystic duct, and then be aware of where the common bile duct was located?
>
> A.    Yes.

11

He further testified that he saw the portion of the cystic duct that he needed to see in order to identify the cystic duct. He stated that the cystic duct was short and about the size of a small matchstick; he performed an IOC to be certain that the structure identified was in fact the cystic duct, and although the cystic duct was not visible in the IOC results introduced at trial, which were still photographs, he could see the cystic duct during fluoroscopy. Once he had completed the IOC, he knew that the clip he had placed to hold the catheter was on the cystic duct; he was "absolutely certain" that he had identified the cystic duct. According to his testimony, if he had at that point in the surgery misidentified the cystic duct, he would not have been able to see the dye flowing in the lower part of the duct system. He also testified that he had identified the cystic duct at three separate points during the surgery.

Dr. Malik could not account for the subsequent misplacement of the permanent surgical clip other than by conjecture. He stated that prior to cutting the duct, he pulled out the catheter, and to do that, he took off the clip; he then put three clips on the area before cutting the duct. He stated that in choosing where to place the permanent clips, his "deduction" was that he would put the permanent clips where the clip holding the catheter had been "because [he] knew that that clip did not impinge or encroach on the bile duct,

so [his] assumption was that if [he] used the same location to put [the] permanent clips that [he] would be safe."

As to his decision not to convert to an open procedure, he stated that the chances of avoiding putting the clip on her common bile duct would not have been better if he had converted to an open procedure. He stated that although failing to attempt to identify the cystic duct would be a breach of the standard of care, misidentifying the duct is not.

Dr. Malik also testified that injury to the common bile duct is a known risk of the surgery and that he discussed that fact with Herrera prior to the surgery. He referred to plaintiff's exhibit 18, a booklet listing the risks and complications of the procedure and specifically including injury to the common bile duct as a risk. He stated that he explained the procedure to Herrera using the booklet and then gave it to her. He answered in the affirmative when asked by Herrera's counsel if he believed that "that part of the booklet referred to the risk of injury to the structures in the common bile duct that could occur despite reasonable and prudent surgical technique," and if that is what he intended for Herrera to believe. The consent form signed by Herrera before her operation also listed injury "to the tube between the liver and the bowel" as a risk of the surgery, which Dr. Malik testified referred to a risk of injury to the structures in the common bile duct.

13

During Dr. Franklin's testimony, Herrera's counsel went over Dr. Franklin's extensive qualifications in great detail, including discussion of the numerous articles that he has authored; the four to six thousand laparoscopic gallbladder surgeries he has performed; and all the places in the world he has traveled to give presentations on laparoscopic surgeries, some of which specifically included topics on how to prevent biliary tract injuries during laparoscopic gallbladder surgery. Herrera's counsel questioned Dr. Franklin on his opinions about whether Dr. Malik should have converted the surgery to an open procedure, his review of Herrera's medical records, the complications and conditions associated with surgery, and Dr. Malik's technique and decisions during Herrera's surgery. Dr. Franklin testified that even though he performs IOCs, sometimes the cystic duct cannot thereby be identified, but even so, he does not always then convert to an open procedure. He stated that converting to an open procedure will "[a]bsolutely not" guarantee that there will not be injury to the common duct and elaborated that "[i]n actual fact, one can see better laparoscopically than open."

Dr. Franklin gave his opinion on what should be done by the surgeon performing a laparoscopic cholecystectomy in a step-by-step manner from the beginning to the end of the surgery. Dr. Franklin then gave his opinion that Dr. Malik was not negligent:

A.    Based on review of the records, based on review of the operative report, many years of experience in the way we teach the technique, I saw no departure whatsoever from the standard of care, nor of negligence.

Q.    Do you have an opinion as to whether or not—using these definitions of negligence and ordinary care, as to whether or not Dr. Malik was negligent in not converting this laparoscopic procedure to an open procedure?

. . . .

A.    In my opinion, no.

Q.    Why?

. . . .

A.    Because as I read the records, including the op note, I felt that he acted as a prudent and ordinary surgeon would act and there was no indication to convert to open.

He further testified that he himself had injured the common bile duct of two patients in the past after misidentifying the cystic duct and that he still met the standard of care. He testified that if Dr. Malik was in error in identifying the cystic duct, it was not in violation of reasonably prudent general surgery standards under the circumstances.

When asked if the biliary tract injury rate in open procedures is significantly less than in laparoscopic procedures overall, taking into account all skill levels of operators, Dr. Franklin testified that he did not know of any scientific study that has shown "any difference at all," and based on anecdotal

15

evidence from "many discussions at many meetings," that at the time of trial the rates were "almost exactly the same." Dr. Franklin later in his testimony stated that the incidence of injury to the bile duct in an open procedure was three injuries per one thousand surgeries, in laparoscopic procedures, four and a half injuries per one thousand surgeries. When asked about Herrera's position that in converting from a laparoscopic procedure to an open procedure, a surgeon could use sutures rather than clips to prevent the misidentification and misclamping off of the common duct, he disagreed with that position and explained that "[i]n the old days," before surgeons had reliable clips and sutures were used instead, "[W]e still had an incidence of common bile duct injury of about 0.3 percent . . . . So using sutures doesn't immune one from having an injury in the main bile duct."

In response to a question from the jury about the feasibility of taking out all the surrounding connective tissue to be able to expose the entire cystic duct, he testified that "[m]ost people do not recommend dissecting the duct entirely out because this is where we get into problems. We get tears in the main bile duct, which may or may not be seen, and will lead to a postoperative leak." Finally, Herrera's counsel asked Dr. Franklin a question from the jury, who wanted to know — based on Dr. Malik's testimony that the difficulty of the procedure performed on Herrera was above average, that Herrera's cystic duct

16

was shorter than normal, and that the clip "likely" went over the connective tissues and could not be visualized on the cystic duct—whether Dr. Franklin would have done anything more to verify that the common duct was not clipped if he were operating on his wife or other loved one. Dr. Franklin answered, "I would have done exactly what he did, which was dissect out what I thought was the cystic duct and place the clip accordingly."

Although Herrera's expert, Dr. Gail Burbridge, testified that, given the many warning signs and difficulty in identifying the structures in Herrera, Dr. Malik should have converted to an open procedure and that his failure to do so violated the standard of care, this testimony was controverted by Dr. Franklin and Dr. Malik. We hold that the evidence offered by Dr. Malik at trial was more than a scintilla and that Herrera's evidence did not establish Dr. Malik's negligence as a matter of law.

Further, the jury, as the sole judge of the witnesses' credibility, was free to evaluate and give more weight to Dr. Malik's and Dr. Franklin's opinions on the standard of care.[21] Dr. Malik's and Dr. Franklin's testimony as to Dr. Malik's actions during surgery and their statements that these actions met the applicable standard of care, Dr. Franklin's statements that he would not have

---

[21] *See Jackson*, 116 S.W.3d at 761.

17

done anything different than what Dr. Malik did and that he also on two occasions had injured a patient's bile duct even when meeting the standard of care, and the evidence that injury to the bile duct is a known risk of the procedure even when a surgeon meets the applicable standard of care all support the jury finding that Dr. Malik's error did not rise to the level of negligence. The evidence supporting the jury's finding is not so weak or the findings so contrary to the great weight and preponderance of the evidence as to be clearly wrong or unjust.[22] Because the evidence is both legally and factually sufficient to support the jury finding that Dr. Malik was not negligent, we overrule Herrera's first issue.

Herrera's second issue relates to the jury's answer on the damages question. Her fourth issue relates to the trial court's refusal to submit some of her requested definitions with respect to the damages question. Because we have held that the evidence supports the no-negligence finding, we overrule Herrera's second and fourth issues as moot.[23]

---

[22] *See Dow*, 46 S.W.3d at 242.

[23] *See* TEX. R. APP. P. 47.1.

18

**V.  Conclusion**

Having overruled each of Herrera's four issues, we affirm the judgment of the trial court.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, HOLMAN, and WALKER, JJ.

DELIVERED: August 7, 2008